**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ROBERT MARESCA, derivatively on behalf of

AMPIO PHARMACEUTICALS, INC.,

      Plaintiff,

v.

MICHAEL A. MARTINO, MICHAEL MACALUSO,
HOLLI CHEREVKA, DAVID BAR-OR,
DAVID STEVENS, J. KEVIN BUCHI,
PHILIP H. COELHO, and RICHARD B. GILES,

      Defendants,

-and-

AMPIO PHARMACEUTICALS, INC., a Delaware Corporation,

      Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

---

Plaintiff Robert Maresca ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively

and on behalf of Ampio Pharmaceuticals, Inc. ("Ampio" or the "Company"), files this Verified

Shareholder Derivative Complaint against Individual Defendants Michael A. Martino ("Martino"),

Michael Macaluso ("Macaluso"), Holli Cherevka ("Cherevka"), David Bar-Or ("Bar-Or"), David

1

Steven ("Stevens"), J. Kevin Buchi ("Buchi"), Philip H. Coelho ("Coelho"), and Richard B. Giles ("Giles") (collectively, the "Individual Defendants," and together with Ampio, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Ampio, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ampio, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Ampio's directors and officers from December 29, 2020 to August 3, 2022 (the "Relevant Period").

2.       Ampio is a biopharmaceutical company primarily focused on the advancement of immunomodulatory therapies for the treatment of pain resulting from osteoarthritis in the knee and potentially other articular joints.

3.      Ampio's lead product candidate, ampion, is a platform for treating multiple inflammatory conditions and is being studied in a wide range of serious, debilitating and often life-threatening inflammatory diseases in the joints, lungs, kidneys, and other organs ("Ampion"). Ampion is also in development for being used as an inhaled treatment for critical COVID-19 patients and as an at home treatment for COVID-19 patients that have developed long-term respiratory symptoms.

4.      In order for the Company to bring the product to the market, Ampio needed to complete a Biologics License Application ("BLA"). The process to get a BLA required the Company to carry out several clinical trials tailored specifically to Ampion.

5.      In November 2012, the Company began its first clinical trial after it received approval to start conducting the study from the Food and Drug Administration ("FDA") and the guidance on how to conduct the study from the Center for Biologics Evaluation and Research ("CBER"). The first clinical trial was successful, but it did not cover all the endpoints that the Company wanted it to cover.

6.      In January 2014, the Company proceeded to start its second clinical trial (defined below), which was essential for the Company in obtaining BLA. However, the second clinical trial failed miserably. The Company then decided to initiate another second trial (defined below).

7.      In July 2015, the Company started its new second trial (defined below). However, that failed as well. The Company was in a midst of chaos because it couldn't obtain the BLA and was continuously running into unsuccessful clinical trials.

8.     In June 2019, the Company began a phase III clinical trial titled "A Randomized, Controlled, Double-Blind Study to Evaluate the Efficacy and Safety of an Intra-Articular Injection of Ampion in Adults with Pain Due to Severe Osteoarthritis of the Knee" (the "AP-013 study").

9.     In March 2020, the Company halted the AP-013 study due to the COVID-19 pandemic. However, the Company claimed in December 2020, that the FDA had given the Company an approval to continue with the study without re-running the trial.

10.    After that, the Individual Defendants on numerous occasions falsely stated that Ampion was effective in reducing inflammation and that the Company had been receiving positive FDA guidelines.

11.    On November 10, 2021, the Company filed its quarterly report with the SEC for the period ended September 30, 2021 on a Form 10-Q (the "3Q21"). In 3Q21, the Company assured the stockholders that Ampio had enough liquidity to successfully fund the operations throughout the first quarter of 2023.

12.    On the same day, in its earnings call, Defendant Cherevka falsely stated that Ampion study results had been positive. Later in December 2021, Defendant Martino, who was the Company's new Chief Executive Officer ("CEO"), falsely stated that the Company was appropriately applying for an FDA guidance for AP-013 study.

13.    On March 2, 2022, Ampio disclosed that it has submitted a Type C[1] meeting request to the FDA for the development and review of Ampion.

---

[1] A Type C meeting is where the applicant meets with the CBER/FDA to go over the development and the review of a product that does not fall under the Type A or Type B scope.

14.     However, on April 20, 2022, the Company issued a press release in which it disclosed that the FDA did not respond positively to the Company Type C meeting request because the FDA, among other reasons, did not believe that "AP-013 could serve as a second pivotal trial for Ampion." The FDA communication also disclosed that AP-013 was not sufficient for the Company to receive a regulatory approval in the United States or any other country.

15.     After this press release came out, the share price of Ampio stock fell to a close of $0.25 per share on April 21, 2022 from closing at $0.34 per share the prior trading day, on April 20, 2022, which was a stock drop of 26.47%.

16.     On May 16, 2022, Ampio announced that the Company's Board of Directors ("Board") created a special committee ("Special Committee") to conduct an internal investigation with the help of independent counsel over Ampio's AP-013 study and other clinical trials.

17.     After this news came out, the Company's share price fell from a close of $0.22 per share on May 16, 2022, to close at $0.18 per share on May 18, 2022. The share price fell 10%.

18.     On August 3, 2022, Ampio issued a letter to its stockholders written by Defendant Martino and Defendant Buchi (the "Stockholder Letter") concerning the results of the Special Committee's investigation. The Stockholder Letter disclosed that Ampio's senior executive officers and senior staff were aware of the failure of AP-103 study since March 2020. The letter further stated that the senior executives and senior staff were aware of the fact that AP-013 did not demonstrate efficacy for Ampion with regards to its co-primary endpoints of pain and function. The letter further stated that the senior executives and staff who were aware of this failed to disclose the actual results of AP-013 trial and the timing of unblinding of data from the AP-013

trial. The letter also revealed that certain executives and former directors "facilitated the provision of Ampion for unauthorized use."

19.     After the results of the Special Committee investigations were revealed in the Stockholder Letter, the Company's share price fell to a close at $0.10 per share on August 3, 2022, representing a staggering 96.25% declination in Ampio's market share compared to the beginning of the Relevant Period, where the Company's shares closed at a high of $2.76 per share on December, 22, 2020. The Company also admitted that after several phase 1 and 2 clinical trials involving over 1,500 patients, "Ampion has simply not demonstrated a sufficient therapeutic benefit versus saline to support another superiority trial and a noninferiority trial versus saline would not be commercially competitive."

20.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company hyped its ability to successfully file a BLA for Ampion; (2) the Company provided exaggerated results of the AP-013 study; (3) the Company similarly misstated the true timing of unblinding of data from the AP-013 study, and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

21.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

22.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls. As stated in the Form 10-Q that the Company filed with the SEC on May 16, 2022 for the quarter ended March 31, 2022 ("1Q22"), "[b]ased upon this evaluation, the CEO and the CFO concluded that our disclosure controls and procedures as of the end of the period covered by this report were not effective due to the matters identified as part of the Company's decision announced on May 16, 2022 to conduct an internal investigation, to be overseen by an independent special committee, as described in Part II, Item 5 of this Quarterly Report on Form 10-Q."

23.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. The Company repurchased 138,514 shares of its common stock at inflated prices during the Relevant Period for over $78,953. As the Company's stock was actually only worth $0.10 per share, the price at close on August 3, 2022, the Company overpaid approximately $65,102 in total.

24.     Furthermore, during the Relevant Period, two of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $214,468.

25.     In light of the Individual Defendants' misconduct, which has subjected Ampio, its current and former CEOs, and its former Chief Operating Officer ("COO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Colorado (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual

Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

26.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Ampio's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

28.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31.     The court has personal jurisdiction over each Defendant because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she has, directly or indirectly, used the means and instrumentalities of interstate commerce, some of which are, the mails, interstate telephone communications, and the facilities of the national securities markets.

32.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

33.     Plaintiff is a current shareholder of Ampio common stock. Plaintiff has continuously held Ampio common stock at all relevant times.

### Nominal Defendant Ampio

34.     Ampio is a Delaware corporation with its principal executive offices at 373 Inverness Parkway, Suite 200, Englewood, Colorado 80112. Ampio's shares trade on the NYSE under the ticker symbol "AMPE."

### Defendant Martino

35.     Defendant Martino has served as the Company's CEO since November 2021 and a director since October 2021. According to the Company's Schedule 14A filed with the SEC on July 5, 2022 (the "2022 Proxy Statement"), as of June 22, 2022, Defendant Martino beneficially owned 533,333 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on June 22, 2022 was $0.19, Defendant Martino owned approximately $101,333 worth of Ampio stock.

36.     For the fiscal year ended December 31, 2021 ("2021 Fiscal Year"), Defendant Martino received $760,718 in executive compensation and $221,498 in director compensation from the Company. This included $60,417 in salary, $700,301 in stock awards, $208,477 in option awards, and $13,021 in fees earned or paid in cash.

37.     The Company's 2022 Proxy Statement stated the following about Defendant Martino:

> *Michael A. Martino* was appointed by the Board of Directors as the Company's Chief Executive Officer on November 22, 2021. Mr. Martino has served as a director of the Company since October 2021. Mr. Martino previously served as President, Chief Executive Officer and a director of HemaFlo Therapeutics Inc., a private company focused on the treatment of acute kidney injury, since January 2016. Prior to HemaFlow, Mr. Martino was President and Chief Executive Officer of Ambit Biosciences, a company focused on the development of a drug to treat acute myeloid leukemia, from November 2011 to November 2014. Under his leadership, Ambit initiated a large, multi-national Phase III study; secured $25 million in private financing; completed a $90 million initial public offering; and ultimately sold the company to a large, Japanese pharmaceutical company for $450 million in cash plus future milestone payments. Mr. Martino also previously served as President, Chief Executive Officer and a director of Arzeda, a synthetic biology company, and Sonus Pharmaceuticals, an oncology drug development company. In addition, Mr. Martino currently serves on the board of Caravan Biologix, a private company primarily focused on the development of novel oncology drugs, and was a founding director at Excision BioTherapeutics, Inc. Mr. Martino has a BBA from Roanoke College, where he served as a Trustee from 2016 to 2020, and a MBA from Virginia Tech. Mr. Martino has extensive experience in life sciences and his experience as the chief executive officer and director of other pharmaceutical companies, both public and private, leading drug development from preclinical through Phase 3 clinical trials, transacting mergers, and leading capital raises are the attributes that qualify him to serve as a member of our Board.

**Defendant Macaluso**

38.     Defendant Macaluso has served as Ampio's advisor to the CEO from November 2021 to May 2022, director from March 2010 to May 2022, CEO from January 2012 to November 2021, and Chairman of the Board from May 2010 to November 2021. According to the 2022 Proxy Statement, as of June 22, 2022, Defendant Macaluso beneficially owned 2,024,882 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 22, 2022 was $0.19, Defendant Macaluso owned approximately $384,727 worth of Ampio stock.

39.     For the 2021 Fiscal Year, Defendant Macaluso received $1,914,818 in compensation from the Company. This included $356,818 in salary and $1,558,000 in stock awards.

40.     The Company's Schedule 14A filed with the SEC on June 30, 2021 (the "2021 Proxy Statement"), stated the following about Defendant Macaluso:

> *Michael Macaluso* founded DMI Life Sciences Inc. and was a member of the board of directors of DMI Life Sciences Inc., our predecessor, from its inception until the merger of DMI Life Sciences, Inc. with Chay Acquisitions, Inc., a wholly owned subsidiary of Chay Enterprises, Inc. (together "Chay Enterprises"). Mr. Macaluso has been a member of our Board since the merger with Chay Enterprises in March 2010, our CEO since January 2012, and the Chairman of our Board since May 2010. In addition, Mr. Macaluso has been a member of the board of directors of NASDAQ-listed Aytu BioScience's (AYTU) since April 2015. Mr. Macaluso was appointed President of Isolagen, Inc. (ILE), which has since been acquired, and served in that position from June 2001 to August 2001, when he was appointed CEO. In June 2003, Mr. Macaluso was re-appointed as President of Isolagen, Inc. and served as both CEO and President until September 2004. Mr. Macaluso also served on the board of directors of Isolagen, Inc. from June 2001 until April 2005. From October 1998 until June 2001, Mr. Macaluso was the owner of Page International Communications, a manufacturing business. Mr. Macaluso was a founder and principal of International Printing and Publishing, a position Mr. Macaluso held from 1989 until 1997, when he sold that business to a private equity firm. Mr. Macaluso's

experience in executive management and marketing within the pharmaceutical industry, monetizing company opportunities and corporate finance led to the conclusion of our Board that he should serve as a director of our Company.

41.     Upon information and belief, Defendant Macaluso is a citizen of Colorado.

**Defendant Cherevka**

42.     Defendant Cherevka served as the Company's President from October 2021 to May 2022, CEO from September 2017 to May 2022, Vice President of Operations from May 2015 to September 2017, senior director of clinical trials from November 2013 to May 2015, and director of clinical trials from January 2013 to November 2013. According to the 2022 Proxy Statement, as of June 22, 2022, Defendant Cherevka beneficially owned 110,820 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 22, 2022 was $0.19, Defendant Cherevka owned approximately $21,055 worth of Ampio stock.

43.     For the 2021 Fiscal Year, Defendant Cherevka received $1,126,591 in compensation from the Company. This included $301,591 in salary, $5000 in bonus, and $820,000 in stock awards.

44.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cherevka made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/27/2021 | 74,631 | $2.00 | $149,262 |
| 5/21/2021 | 2,603 | $2.00 | $5,206 |

Thus, in total, before the fraud was exposed, she sold 77,234 Company shares on inside information, for which she received approximately $154,468. Her insider sales made with

knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

45.     The Company's 2021 Proxy Statement stated the following about Defendant Cherevka:

> *Holli Cherevka* has served as our COO since September 2017.  Prior to taking her current role, Ms. Cherevka served as our Vice President of Operations and oversaw the clinical, regulatory, and manufacturing operations. Since starting at Ampio in January 2013, she has held the following additional roles of increasing responsibility including: Director of Clinical Trials (from January 2013 to November 2013), Senior Director of Clinical Trials (from November 2013 to May 2015), Vice President of Operations (from May 2015 to September 2017) and COO (from September 2017 to current). Previously, Ms. Cherevka was the Director of Business Development at the American College of Radiology (ACR) Image Metrix from 2011 to 2013. Ms. Cherevka earned a B.A. degree from California State University, Chico, and an M.S. degree in biomedical and molecular sciences research from King's College, London. Ms. Cherevka is a member of the Parenteral Drug Association, Colorado Bioscience Association and the International Society of Pharmaceutical Engineers, and a board member of the Professional Science Master's in Biomedical Sciences (PSM) program at the University of Denver. She  has represented Ampio Pharmaceuticals at conferences for the International Society of Pharmaceutical Engineers as well as at Global Investment Conferences and shareholder meetings.

46.     Upon information and belief, Defendant Cherevka is a citizen of Colorado.

**Defendant Bar-Or**

47.     Defendant Bar-Or has served as a Company director since March 2010 until he resigned in May 2022, Chief Scientific Officer ("CSO") from March 2010 to September 2018, and the Chairman of the Board from March 2010 to May 2010. According to the 2021 Proxy Statement, as of June 15, 2021, Defendant Bar-Or beneficially owned 481,800 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of

trading on June 15, 2021 was $1.89, Defendant Bar-Or owned approximately $910,602 worth of Ampio stock.

48.     For the 2021 Fiscal Year, Defendant Bar-Or received $221,381 in compensation from the Company. This included $38,500 in fees earned or cash paid, $20,000 in stock awards, and $162,881 in option awards.

49.     The Company's 2021 Proxy Statement stated the following about Defendant Bar-Or:

> *David Bar-Or, M.D.,* has served as a member of our Board since March 2010. Dr. Bar-Or previously served as our Chief Scientific Officer ("CSO") from March 2010 until September 2018. Dr. Bar-Or also served as our Chairman of the Board from March 2010 until May 2010. From April 2009 until March 2010, he served as Chairman of the Board and CSO of DMI Life Sciences, Inc. (our predecessor). Dr. Bar-Or is currently the owner of Trauma Research, LLC and the director of Trauma Research at Swedish Medical Center, Englewood, Colorado, St. Anthony's Hospital, Lakewood, Colorado, Penrose Hospital, Colorado Springs, Colorado, Research Medical Center, Kansas City, Missouri, Wesley Medical Center, Wichita, Kansas and The Medical Center of Plano, Plano, Texas. Dr. Bar-Or is the founder of Ampio Pharmaceuticals, Inc. and was principally responsible for all patented and proprietary technologies, which were acquired by the Company from DMI BioSciences, Inc. He was also primarily responsible for our patents issued and applied for since then, having been awarded over 500 patents and been an inventor on almost 120 patent applications over the life of the Company. Dr. Bar-Or has authored or co-authored over 200 peer- reviewed journal articles and several book chapters. Dr. Bar-Or is a reviewer for over 45 peer reviewed scientific and clinical journals. He is the recipient of the Gustav Levi Award from the Mount Sinai Hospital, New York, New York, the Kornfeld Award for an outstanding MD Thesis, the Outstanding Resident Research Award from the Denver General Hospital, and the Outstanding Clinician Award from the Denver General Medical Emergency Resident Program. Dr. Bar-Or received his medical degree from The Hebrew University, Hadassah Medical School, Jerusalem, Israel, following which he completed a biochemistry fellowship at Hadassah Hospital and undertook post-graduate residency training at Denver Health Medical Center, specializing in emergency medicine, a discipline in which he is board certified. He completed the first research fellowship in Emergency Medicine at Denver Health Medical Center. Among other experience, qualifications, attributes and skills, Dr. Bar-Or's medical training, extensive involvement, and inventions in researching

and developing Ampion®, and leadership role in his hospital affiliations led to the conclusion of our Board that he should serve as a director of our Company.

50.     Upon information and belief, Defendant Bar-Or is a citizen of Colorado.

**Defendant Buchi**

51.     Defendant Buchi has served as a Company director since October 2021. He also serves as the Chair of the Board and as a member of the Audit Committee. According to the 2022 Proxy Statement, as of June 22, 2022, Defendant Buchi beneficially owned 85,417 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 22, 2022 was $0.19, Defendant Buchi owned approximately $16,229 worth of Ampio stock.

52.     For the 2021 Fiscal Year, Defendant Buchi received $254,498 in compensation from the Company. This included $11,521 in fees earned or cash paid and $242,977 in option awards.

53.     The Company's 2022 Proxy Statement stated the following about Defendant Buchi:

*J. Kevin Buchi* is the former President and Chief Executive Officer of Cephalon, Inc., having also served as corporate vice president of global branded products at Teva Pharmaceutical Industries Limited after Teva acquired Cephalon in October 2011. Mr. Buchi also served as President and Chief Executive Officer of TetraLogic Pharmaceuticals and Biospecifics Technologies. Mr. Buchi joined Cephalon in 1991 and held various leadership positions during his tenure, including Chief Financial Officer and Chief Operating Officer, before becoming Cephalon's Chief Executive Officer in 2010. In addition, Mr. Buchi currently serves as a Director of Amneal Pharmaceuticals, Inc. and Benitec Biopharma Ltd. Mr. Buchi previously served on the boards of several pharmaceutical companies, including Dicerna Pharmaceuticals, EPIRUS Biopharmaceuticals, Inc., Alexza Pharmaceuticals, Inc., and Forward Pharma A/S. He holds a B.A. in Chemistry from Cornell University and a Master of Management, Accounting, and Finance from the Northwestern University Kellogg School of Management. Mr. Buchi has served on our board since October 2021. Mr. Buchi's extensive experience as a senior executive and board member in the pharmaceutical industry provide him with knowledge of a

broad range of unique insights into the industry of our business, and these are the attributes that qualify him to serve as a member of our Board.

**Defendant Coelho**

54.     Defendant Coelho has served as a Company director from April 2010 until he resigned in May 2022. According to the 2021 Proxy Statement, as of June 15, 2021, Defendant Coelho beneficially owned 829,721 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 15, 2021 was $1.89, Defendant Coelho owned approximately $1.6 million worth of Ampio stock.

55.     For the 2021 Fiscal Year, Defendant Coelho received $357,048 in compensation from the Company. This included $109,667 in fees earned or cash paid, $30,000 in other compensation, $20,000 in stock awards, and $197,381 in option awards.

56.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Coelho made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/27/2021 | 20,000 | $2.00 | $40,000 |
| 4/29/2021 | 3,263 | $2.00 | $6,526 |
| 5/21/2021 | 6,737 | $2.00 | $13,474 |

Thus, in total, before the fraud was exposed, he sold 30,000 Company shares on inside information, for which he received approximately $60,000. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

57.     The Company's 2021 Proxy Statement stated the following about Defendant Coelho:

*Philip H. Coelho* has served as a member of our Board since April 2010. Mr. Coelho is the Chief Technology Officer of ThermoGenesis Corp., a firm he founded in 1986, retired from in 2007, and rejoined in 2017, which invents and commercializes products that isolate, purify, and cryopreserve stem, progenitor and immune cells derived from a donor or the patient's own body to treat human disease. Prior to rejoining ThermoGenesis Corp., Mr. Coelho founded SynGen Inc. in October 2009, and merged that company with ThermoGenesis Corp. in 2017. Mr. Coelho was the President and CEO of PHCMedical, Inc., a consulting firm, from August 2008 through October 2009. From August 2007 through May 2008, Mr. Coelho served as the Chief Technology Architect of ThermoGenesis Corp. From 1989 through July 2007, he was Chairman and CEO of ThermoGenesis Corp. Mr. Coelho served as Vice President of Research & Development of ThermoGenesis from 1986 through 1989. Mr. Coelho has been in the senior management of high technology consumer electronic or medical device companies for over 30 years. He was President of Castleton Inc. from 1982 to 1986, and President of ESS Inc. from 1971 to 1982. Mr. Coelho has also served as a member of the board of directors of NASDAQ-listed company, Catalyst Pharmaceuticals Partners, Inc. (CPRX) since October 2002, and previously served as a member of the board of directors of NASDAQ-listed Mediware Information Systems, Inc. (MEDW) from December 2001 until July 2006, and commencing again in May 2008 until it was sold in December 2012.

## **Defendant Giles**

58.     Defendant Giles has served as a Company director from August 2010 until he resigned in May 2022. According to the 2021 Proxy Statement, as of June 15, 2021, Defendant Giles beneficially owned 1,095,121 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 15, 2021 was $1.89, Defendant Giles owned approximately $2.1 million of worth of Ampio stock.

59.     For the 2021 Fiscal Year, Defendant Giles received $292,881 in compensation from the Company. This included $75,500 in fees earned or cash paid, $20,000 in stock awards, and $197,381 in option awards.

60.     The Company's 2021 Proxy Statement stated the following about Defendant Giles:

*Richard B. Giles, CPA,* has served as a member of our Board since August 2010. Mr. Giles is the CFO and Treasurer of Ludvik Electric Co., an electrical

contractor headquartered in Lakewood, Colorado, a position he has held since 1985. Ludvik Electric Co. is a private electrical contractor that has completed electrical contracting projects throughout the United States, South Africa, and Germany. As CFO and Treasurer of Ludvik Electric Co., Mr. Giles oversees accounting, risk management, financial planning and analysis, financial reporting, regulatory compliance, and tax-related accounting functions. He serves also as the trustee of Ludvik Electric Co.'s 401(k) plan. Prior to joining Ludvik Electric Co., Mr. Giles was an Audit Partner for three years with Higgins Meritt & Company, then a Denver, Colorado CPA firm, and during the preceding nine years he was an Audit Manager and a member of the audit staff of Price Waterhouse, one of the legacy firms which now comprise PricewaterhouseCoopers. While with Price Waterhouse, Mr. Giles participated in a number of public company audits, including one for a leading computer manufacturer. Mr. Giles received a B.S. degree in accounting from the University of Northern Colorado. He is a member of the American Institute of Certified Public Accountants, the Colorado Society of Certified Public Accountants, and the Construction Financial Management Association. Mr. Giles' experience in executive financial management, accounting and financial reporting, corporate accounting and internal controls led to the conclusion of our Board that he should serve as a director of our Company.

61.     Upon information and belief, Defendant Giles is a citizen of Colorado.

**Defendant Stevens**

62.     Defendant Stevens has served as a Company director since June 2011. He also serves as a member of Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of June 22, 2022, Defendant Stevens beneficially owned 683,312 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 22, 2022 was $0.19, Defendant Stevens owned approximately $129,829 worth of Ampio stock.

63.     For the 2021 Fiscal Year, Defendant Stevens received $288,921 in compensation from the Company. This included $71,540 in fees earned or cash paid, $20,000 in stock awards, and $197,381 in option awards.

64. The Company's 2022 Proxy Statement stated the following about Defendant Stevens:

> *David R. Stevens, Ph.D.,* has served as a member of our Board since June 2011. Dr. Stevens has worked in *David R. Stevens, Ph.D.,* has served as a member of our Board since June 2011. Dr. Stevens has worked in the U.S. Food and Drug Administration regulated life science industry since 1978. He has also been a consulting research pathologist since December 2006 for Premier Laboratory, LLC. He has been a board member of Cetya, Inc. since December 2013. He has served on the boards of several other public and private life science companies, including Micro-Imaging Solutions, LLC (from 2007 to 2018), Poniard Pharmaceuticals, Inc. (from 2004 to 2013), Aqua Bounty Technologies, Inc. (from 2002 to 2012), Advanced Cosmetic Intervention, Inc. (from 2006 to 2011) and Smart Drug Systems, Inc. (from 1999 to 2006), and was an advisor to Bay City Capital (from 1999 to 2006). Dr. Stevens was previously President and CEO of Deprenyl Animal Health, Inc., a public veterinary pharmaceutical company, from 1990 to 1998, and Vice President, Research and Development, of Agrion Corp., a private biotechnology company, from 1986 to 1988. He began his career in pharmaceutical research and development at the former Upjohn Company, where he contributed to the preclinical evaluation of Xanax and Halcion. Dr. Stevens received B.S. and D.V.M. degrees from Washington State University, and a Ph.D. in comparative pathology from the University of California, Davis. He is a Diplomate of the American College of Veterinary Pathologists. Dr. Stevens' experience in executive management in the pharmaceutical industry and knowledge of the medical device industry led to the conclusion of our Board that he should serve as a director of our Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65. By reason of their positions as officers, directors, and/or fiduciaries of Ampio and because of their ability to control the business and corporate affairs of Ampio, the Individual Defendants owed Ampio and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ampio in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ampio and its shareholders so as to benefit all shareholders equally.

66.     Each director and officer of the Company owes to Ampio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ampio, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.     To discharge their duties, the officers and directors of Ampio were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ampio, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Ampio's Board at all relevant times.

70.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE,

the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71.     To discharge their duties, the officers and directors of Ampio were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ampio were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Colorado, and the United States, and pursuant to Ampio's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Ampio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)　　establish and maintain systematic and accurate records and reports of the business and internal affairs of Ampio and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)　　maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ampio's operations would comply with all applicable laws and Ampio's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)　　exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)　　refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)　　examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.　　Each of the Individual Defendants further owed to Ampio and the shareholders the duty of loyalty requiring that each favor Ampio's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Ampio and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, and directorial positions with Ampio, each of the Individual Defendants had access to adverse, non-public information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ampio.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a), 10(b) and 20(a) of the Exchange Act.

78.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively

and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Ampio, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ampio and was at all times acting within the course and scope of such agency.

## AMPIO'S CODE OF CONDUCT, AUDIT COMMITTEE CHARTER, AND INSIDER TRADING POLICY

### *Code of Conduct*

81.    The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), states that it:

> [C]overs a wide range of business practices and procedures.  It does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers and employees of Ampio Pharmaceuticals, Inc. and its subsidiaries (collectively, "*Ampio*" or the "*Company*").  All directors, officers and employees are required to be familiar with the Code, comply with its provisions and report any suspected violations as described below in Section 24, Reporting Illegal or Unethical Behavior and Non- Retaliation.  The Code should also be provided to and followed by Ampio's agents and representatives, including consultants.

82.    The Code of Conduct provides that it "seeks to deter wrongdoing" and to promote:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that Ampio files with, or submits to, the Securities and Exchange Commission (the "**SEC**") and in other public communications made by Ampio;

- compliance with applicable governmental laws, rules and regulations; and
- the prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and accountability for adherence to the Code.

83.    The Code of Conduct provides that the Company and its employees, officers, and directors comply with the applicable laws, rules and regulations and states that:

Obeying the law is the foundation on which Ampio's ethical standards are built. You must comply with applicable laws, rules and regulations.  It is your responsibility to know enough about applicable laws, rules and regulations to determine when to seek advice from your direct supervisor or other appropriate Ampio personnel identified in the Code.

84.    The Code of Conduct further provides that "Ampio's policy is to promote high standards of integrity by conducting its affairs honestly and ethically" adding that:

Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job. Ampio has established a structured compliance system to support legal and ethical actions throughout the Company.

Compliance with this policy will be led by the Compliance Officer and the Audit Committee, however, all employees are individually responsible for their compliance with the Code. The Compliance Officer will be supervising the training, auditing, monitoring, testing and communication of the Company's policies. Investigations and enforcement will be carried out by the Compliance Officer and the Audit Committee, who will jointly keep the Board informed of significant compliance issues, risks and trends.

85.    The Code of Conduct states, with regards to insider trading, that:

You are not permitted to use or share confidential information for stock trading purposes or for any other purpose, except the lawful conduct of our business. All non-public information about Ampio should be considered confidential information until it has been adequately disclosed to the public. Also, you may not trade in the securities of other companies about which you learn material, non-public information through the course of your employment with, or service to, Ampio. "Material non-public information" includes information that is not available to the public at large that could affect the market price of Ampio securities or another company's securities and that a reasonable investor would consider important in deciding whether to buy, sell or hold the securities. To use material non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical, but also illegal, and could result in criminal prosecution, in addition to the termination of your employment. In order to assist with compliance with laws against insider trading, the Company has adopted an Insider Trading Policy. A copy of this policy has been distributed to every employee and included within the Employee Handbook. If you have any questions regarding the Company's Insider Trading Policy or as to whether information is material or has been adequately disclosed, please consult Ampio's Compliance Officer.

86.    The Code of Conduct provides that "federal securities laws require Ampio to disclose certain information in various reports that the Company must file with or submit to the SEC" adding that:

In addition, from time to time, Ampio makes other public communications, such as issuing press releases. Ampio expects all directors, officers and employees who are involved in the preparation of SEC reports or other public documents to ensure that the information disclosed in those documents is complete, fair, accurate, timely and understandable. To the extent that you have questions or concerns about the information contained in the SEC reports or other public documents or the process by which they are prepared, you should report those concerns to the Chair of Ampio's Disclosure Committee. To the extent that you reasonably believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns to the Chair of Ampio's Audit Committee.

87.    The Code of Conduct provides reporting guidelines for suspected misconduct and outlines the Company's program of "Code awareness, training, and review" which the Code of

Conduct states is overseen by the Corporate Ethics Officer. The Code of Conduct states, in relevant part:

> If you are aware of a suspected or actual violation of the Code by others or a violation or possible violation of federal or state law or regulation, including violations relating to accounting, internal accounting controls or auditing matters ("Compliance Concerns"), you have a responsibility to report it. You are expected to promptly provide your supervisor or one of the Corporate Ethics Officers with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation.

***Audit Committee Charter***

88.     The Ampio Pharmaceuticals Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

89.     Per the Audit Committee Charter, among the Audit Committee's "purposes" are to "assist the Board with its oversight responsibility," specifically regarding:

> (i) the accounting and financial reporting processes of the Company, (ii) the integrity of the Company's financial statements; (iii) the Company's compliance with legal and regulatory requirements; (iv) the registered independent auditor's qualifications and independence; (v) the performance of the Company's internal audit function; (vi) the evaluation of the performance of the Company's registered independent auditor; and (vii) the audits of the Company's financial statements.

90.     The Audit Committee Charter lists among the Audit Committee's responsibilities, a few of which are:

> *Appointment and Oversight*. The Committee shall be directly responsible and have sole authority for the appointment, compensation, retention and oversight of the work of the registered independent auditor (including resolution of any disagreements between Company management and the registered independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor shall report directly to the Committee.

*          *          *

> *Meetings with Management and the Registered Independent Auditor Concerning*

27

*Earnings Releases and Other Matters*

The Committee shall discuss with management and the registered independent auditor the type of financial information and the type of presentation of that information to generally be disclosed in the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" information or any non-GAAP financial information and compliance with the provisions of Regulation G in this regard). The Committee's discussion in this regard need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.

The Committee shall discuss with management and the registered independent auditor any correspondence from or with regulators or governmental agencies, any employee complaints, or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or audit function.

### Insider Trading Policy

91.     Ampio's insider trading policy (the "Insider Policy") applies to the Company's

"employees, officers, and directors."

92.     Regarding "Trading on Material Nonpublic Information," Insider Policy states that:

**Trading on Material Nonpublic Information**. No director, officer or employee of, or consultant or contractor to, the Company, and no member of the immediate family or household of any such person, shall engage in any transaction involving a purchase or sale of the Company's Securities, including any offer to purchase or offer to sell, during any period commencing with the date that he or she possesses Material Nonpublic Information concerning the Company, and ending at the beginning of the second Trading Day following the date of public disclosure of that information (or earlier at the time as the Chief Financial Officer acting in his capacity as Chief Compliance Officer determines that such information has been adequately disseminated to the public) or at such time as such nonpublic information is no longer material. As used herein, the term *"Trading Day"* shall mean a day on which national stock exchanges are open for trading. A "Trading Day" begins at the time trading begins on such day. This restriction on trading does not apply to transactions made under an approved Rule 10b5-1 trading plan. In addition, no Insider may trade in any interest or position relating to the future price of the Company's Securities, such as a put, call or short sale.

93. Regarding the liability for "Insider Trading", the Insider Policy states that:

> **Liability for Insider Trading**. Pursuant to federal and state securities laws, Insiders may be subject to criminal and civil fines and penalties as well as imprisonment for engaging in transactions in the Company's Securities at a time when they have knowledge of Material Nonpublic Information regarding the Company.

94.     The Individual Defendants violated the Code of Conduct, the Audit Charter and the Insider Policy by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same.

95.     In addition the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company' disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background of the Company and its Primary Product Candidate

96.     Ampio is a biopharmaceutical Company focused on developing novel therapies for prevalent inflammatory conditions – conditions in which limited options exist.

97.     Ampio filed its registration statement on Form S-1 with the SEC on November 12, 2010 (the "Registration Statement"). In the Registration Statement, the Company disclosed its lead product, Ampion – an investigational new drug ("IND").

98.     Ampion is a non-steroidal, low molecular weight, anti-inflammatory biologic to treat severe osteoarthritis of the knee ("OAK").

99.     Ampio has been seeking to bring Ampion to the market through a BLA, which is a request for permission to introduce a biologic product into interstate commerce. The BLA is regulated under 21 CFR 600-680. The BLA process requires the Company to complete a number of clinical trials and tailor each process specifically to each product.

100.     Ampio also stated in the Registration Statement that the Company has planned to conduct the phase I and II trials in India or Australia. The Company further stated that each trial would cost under $0.5 million and would start in either second or third quarter of 2011. The expected completion date was twenty-four months.

101.     In 2010, the Company also stated that Ampio was expected to apply for an approval for a phase II double-blind, placebo-controlled clinical study of Ampion. The study would help to explore if Ampion could be used for treating chronic inflammatory and autoimmune disease.

102.     The Company issued a press release in October 2011 that stated the results of the Company's clinical trial – Ampion-In-Knee Australian clinical trial. Defendant Macaluso stated that the first ever trial of Ampion on humans disclosed that the drug was "well tolerated and reduced pain over and above steroids." Defendant Macaluso further stated in the press release that "[t]he completion of this expansion will allow Ampio to augment the data that will be presented to the FDA."

103.     In June 2012, the Company disclosed that it had completed a meeting with the FDA that was required before starting to work on an IND. The Company stated that it has reached an

agreement with the FDA about the design of a clinical trial for Ampion to treat OAK in the United States.

104.    In November 2012, the Company announced that CBER has given the Company guidance on how to conduct the trial. CBER is a division of the FDA, and it gave guidance to Ampio on how to conduct open label and placebo-controlled trials that would maximize clinical efficacy data and patient safety.

105.    In April 2013, the FDA approved Ampio's request to conduct a study on fifteen patients of its IND to treat OAK ("AP-003-A"). The study showed a positive outcome.

106.    In August 2013, the Company issued a press release on the positive results of AP-003-A and stated that there were still some primary objectives that were not fulfilled in the study.

107.    In December 2013, the Company stated in a press release that the FDA approved the results of AP-003-A. The Company also stated that the FDA provided guidance to conduct its second and final trial for Ampion with regards to its treatment of OAK ("AP008"). The second trial was crucial for Ampio because it would allow Ampio to receive the BLA and start producing and selling Ampion on market.

108.    In 2015, the Company completed AP008. However, the study failed because it was not able to reach the primary endpoints set by Ampio.

109.    In July 2015, the Company arranged a call with its investors to disclose the results of its meeting with the FDA after the failure of AP008. In the call, the Company announced that it would conduct a special protocol assessment ("SPA"). In a SPA, the Company would write an agreement outlining the size and design of the clinical trial so that the Company could use it to form the basis for efficacy for a BLA filing.

110.    According to the SPA, the Company needed to complete a second phase III pivotal

trial for Ampion ("Phase III trial"). On September 22, 2015, when the Phase III trial commenced,

Defendant Macaluso stated in a news release that:

> [T]his second pivotal trial is clinically identical to the previously successful Spring
> Study, which was confirmed by the agency as one of the two pivotal trials required
> for approval. In our recent communication with the agency confirming the SPA,
> the FDA wrote: protocol AP-003-B is adequate to serve as a pivotal trial in support
> of a future BLA. With positive results and an SPA, Ampion™ has a clearly defined
> path to market.[2]

111.    In June 2016, Ampio announced the results of the Phase III trial. The results were

similar to AP008 and failed to meet the primary endpoint. These results caused the Company to

worry about getting the BLA. The Company then tried to meet with the CBER twice in 2016 to

figure out how the Company could obtain a BLA. The Company struggled for the next few years

and failed to advance the product through its late-stage clinical trials in the United States.

112.    In June 2019, the Company received a second SPA from the FDA to conduct

another phase III trial. The trial was called the AP-013 study. Due to COVID-19 pandemic, in

March 2020, the Company closed the patient enrollment for the AP-013 study and eventually

paused all activities related to that study.

113.    In September 2020, Ampio announced that the Company conducted a phase I

clinical trial on Ampion's treatment for COVID-19 patients ("AP-016") and the results were

positive.

---

[2]https://www.prnewswire.com/news-releases/ampio-receives-special-protocol-assessment-spa-from-the-fda-and-commences-second-phase-iii-pivotal-trial-of-ampion-300146610.html

114.     In October 2020, Ampio began its phase I clinical trial to study the effects of inhaled Ampion in COVID-19 patients with respiratory distress issues ("AP-014"). The Company stated that AP-014 showed "an improvement in all-cause mortality in COVID-19 patients."

115.     However, the Individual Defendants knew prior to closing the activities related to the AP-013 study that the study did not exhibit a positive result as it failed to indicate any efficacy for Ampion with regards to its primary endpoints of pain and function.

**False and Misleading Statements**

***December 29, 2020 Press Release***

116.     On December 29, 2020, Ampio issued a press release titled "Ampio Receives Feedback from the FDA on Ampio's Proposed Modifications to the Special Protocol Assessment for Ampion Treatment of Severe Osteoarthritis of the Knee." Ampio stated in the press release that the FDA allowed the Company to "complete the [AP-013] study without running the trial." It further stated that "[t]he FDA options gives us the opportunity to provide additional evidence to support the use of existing data/or add more patients to the trial."

***March 3, 2021 Fourth Quarter Earnings Conference Call***

117.     On March 3, 2021, Ampio held its fourth quarter and year-end 2020 earnings conference call. In the call, Defendant Cherevka spoke about the effectiveness of Ampion's ability to reduce inflammation. Defendant Cherevka knowingly made false claims stating that, "[I]n the laboratory, Ampion has been shown to uniquely reduce inflammation along multiple pathways, unlike other anti-inflammatory therapies that target only one pathway."

***May 5, 2021 Press Release***

118.    On May 5, 2021 Ampio issued a press release titled "Ampio Pharmaceuticals, Inc. Reports First Quarter 2021 Financial Results and Provides Business Update." In the press release, Ampio stated that "[p]ositive FDA response provides guidance on multiple pathways forward on paused AP-013 Phase III trial in osteoarthritis of the knee (OAK)."

119.    In the press release, Defendant Macaluso stated that:

> This has been an important quarter for Ampio, with noted progress across our therapeutic platform. For example, the FDA has recently responded to our plans for the AP-013 Phase III trial for the intra-articular injection of Ampion for patients suffering from severe osteoarthritis of the knee (OAK). The response not only provides us with flexibility for maintaining the Special Protocol Assessment (SPA) but, in addition, allows us to consider several alternative paths forward to an optimal solution that may include strategic discussions with potential partners for the commercialization, and expansion of osteoarthritis indications, of Ampion.

### *June 16, 2021 Press Release*

120.    On June 16, 2021, the Company issued a press release titled "Ampio Provides Update on Osteoarthritis of the Knee (OAK) Program, Reiterates Compelling Data in Earlier Phase III Trials of Ampion in Severe OAK." The press release contained Defendant Macaluso's false statements regarding the effectiveness of Ampion stating that:

> Ampion is on track to become the first novel drug with unique mechanisms of action on the market for OAK in over 20 years. Ampion treatment has demonstrated consistent clinical efficacy in patients suffering from OAK across multiple trials, periods of time and clinical sites. In addition, the FDA has provided written confirmation that the AP-003-A study provides evidence of the effectiveness of Ampion" continued Macaluso. "We continue to remain confident the data from the suspended Phase III AP-013 trial will show similar safety and efficacy, but the decision whether to unblind this double masked, randomized controlled study or to continue adding patients ideally should be jointly decided with future potential partners.

### *June 30, 2021 Proxy Statement*

121.    On June 30, 2021, the Company filed its 2021 Proxy Statement. Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

122.    The 2021 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) elect Defendant Macaluso, Bar-Or, Coelho, Giles and Stevens to the Board; (2) ratify the selection of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021; and (3) approve, via non-binding advisory vote, the compensation of the Company's named executive officers.

123.    With respect to the Company's Code of Conduct, the 2021 Proxy Statement stated:

> We have adopted a Code of Business Conduct and Ethics that is applicable to all of our employees, officers, and directors, all of which have read, acknowledged, and agreed to comply with such code. The code is available on our web site, *www.ampiopharma.com*, under the "Investors" tab. We intend to disclose future amendments to, or waivers from, certain provisions of our Code of Business Conduct and Ethics, if any, on the above website within four business days following the date of such amendment or waiver.

124.    With respect to the Company's Insider Policy, the 2021 Proxy Statement mentioned that the Company's insider trading policy was "applicable to all of our employees, officers, and directors" stating that:

> We have adopted an Insider Trading Policy that is applicable to all of our officers and directors and all of our employees, consultants, and contractors (including members of scientific advisory committees), who receive or have access to material nonpublic information about the Company. The Insider Trading Policy prohibits the misuse of material nonpublic information in trading of the Company's securities.  The Insider Trading Policy also prohibits short sales, transactions in derivative securities on the Company's securities, pledges of the Company's securities as collateral for loans, and hedging or monetization transactions or similar arrangements with respect to the Company's securities.

125.    Regarding the Board of Directors' Role in Risk Oversight, the 2021 Proxy Statement said:

> The Board oversees risk management directly and through its committees associated with their respective subject matter areas. Generally, the Board oversees risks that may affect our business, including operational matters and other matters that have been adversely impacted by the COVID-19 pandemic. The Board is also responsible for reviewing and approving the Company's annual insurance policies renewal, which includes Directors and Officers insurance. In addition, as part of its oversight of our Company's executive compensation program, the Board considers the impact of such program, and the incentives created by the compensation awards that it administers, on our Company's risk profile. Our Board, based on the Compensation Committee's review of all of our compensation policies and procedures, considers the incentives that they create and factors that may reduce the likelihood of excessive risk taking and determines whether they present a significant risk to our Company. The Board has determined that, for all employees, our compensation programs do not encourage excessive risk and instead encourage behaviors that support sustainable value creation.

126.    With regards to the Audit Committee oversight responsibility on the accounting and financial reporting, the 2021 Proxy Statement stated:

> The Audit Committee is responsible for oversight of our accounting and financial reporting processes and discusses with management our financial statements, internal controls and other accounting and auditing matters. The Compensation Committee oversees certain risks related to compensation programs and the Nominating and Governance Committee oversees certain corporate governance risks. The Disclosure Committee assists in establishing, implementing, maintaining and evaluating controls or other procedures to ensure that the information required to be disclosed in the Company's reports furnished or filed under the Exchange Act is properly communicated to the CEO and the CFO. As part of their roles in overseeing risk management, these committees periodically report to the Board regarding briefings provided by management and advisors as well as the committees' own analysis and conclusions regarding certain risks faced by us. Management is responsible for implementing the risk management strategy and developing policies, controls, processes and procedures to identify and manage risks.

127.    The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and

misleading statements alleged herein, the insider trading engaged in by two of the Individual Defendants, and Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens' failures to report violations of the Code of Conduct.

128.    Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens further caused the 2021 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 121-126 by failing to disclose that: (1) the Company hyped its ability to successfully file a BLA for Ampion; (2) the Company provided exaggerated results of the AP-013 study; (3) the Company similarly misstated the true timing of unblinding of data from the AP-013 study, and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

129.    As a result of Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) elect Defendant Macaluso, Bar-Or, Coelho, Giles and Stevens to the Board; (2) ratify the selection of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2021; and (3) approve, via non-binding advisory vote, the compensation of the Company's named executive officers.

### *August 4, 2021 Second Quarter Earnings Conference Call*

130.    On August 4, 2021, Ampio held an earnings conference call for its second quarter of 2021. During the call, Defendant Macaluso stated that they have decided to unblind the data from the AP-013 study even though they "have worked diligently with the FDA to gain better understanding of our viable options to preserve the study results to-date, which include keeping the special protocol assessment in place."

131.    Defendant Macaluso further added that the purpose to unblind the data from the AP-013 study was that they wanted to eliminate any bias from the pandemic and that the data would not be released until it had "been properly cleaned and validated" and "properly reflected into the database" as "a requirement of the FDA." However, that was not true because it was later discovered that the decision to unblind the trial was pre-emptively done without the FDA's permission.

***November 10, 2021 Form 10-Q***

132.    On November 10, 2021, the Company filed its 3Q21. The 3Q21 was signed by Defendant Macaluso and contained Sarbanes-Oxley Act of 2022 ("SOX") certifications signed by Defendants Macaluso attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

133.    The 3Q21 made certain to the stockholders that the Company had $17.1 million in cash and cash equivalents, which would provide the Company enough liquidity to fund its operations throughout the first quarter of 2023.

134.    The 3Q21 further stated that:

While the Company believes that the studies currently being conducted will be successful, the Company expects to raise additional capital in both the near and long-term to enable it to support its business operations, including specifically (i) clinical development of Ampion, (ii) Biologics License Application ("BLA") preparation and submission, (iii) existing base business operations and (iv) commercial development activities for Ampion.

***November 10, 2021 Third Quarter Earnings Conference Call***

135.     On November 10, 2021, Ampio held an earnings conference call for its third quarter of 2021. During the call, Defendant Cherevka continued to make false and misleading statements with regards to the effectiveness and efficacy of Ampion.

136.     Defendant Cherevka falsely stated in the conference call that:

In addition to providing evidence if safety and efficacy in pain and function, pre-clinical and early clinical studies have shown that Ampion impacts multiple genes related to repair and regeneration of cartilage. These published findings suggest that Ampion treatment may prime stem cells for both mobilization and chondrogenic differentiation, potentially explaining some of the beneficial effects achieved in clinical trials with the Ampion treatment.

### December 1, 2021 Business Update Conference Call

137.     On December 1, 2021, Ampio held a business update conference call. During the call, Ampio introduced Defendant Martino as the new CEO of the Company.

138.     In the business update conference call, Defendant Martino stated that the Company was applying the FDA guidance appropriately to the AP-013 study. However, this was false and misleading because after a few months of this business update conference call, Defendant Martino's statements turned out to be untrue.

### March 2, 2022 Press Release

139.     On March 2, 2022, the Company issued a press release titled "Ampio Pharmaceuticals, Inc. Release Positive Phase 3 Data Analysis for Ampion Targeting Sever Osteoarthritis of the Knee (OAK)." The Company stated that it had submitted a Type C meeting request to the FDA in order to meet with the CBER division. The Company further stated that it wanted to meet with the CBER division to discuss the development and review of Ampion.

140.     Defendant Cherevka mentioned that the FDA has recommended Ampio to conduct a sensitivity analysis so that it can determine if the COVID-19 pandemic affected the AP-013 study

39

or not. She further stated the Company's sensitivity analysis found "a statistically significant impact from COVID-19, and as specified in our study plan, we have proposed a mITT population to assess efficacy."

141.    The statements in ¶¶ 116-120 and 130-140 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company hyped its ability to successfully file a BLA for Ampion; (2) the Company provided exaggerated results of the AP-013 study; (3) the Company similarly misstated the true timing of unblinding of data from the AP-013 study, and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

### April 20, 2022 Press Release

142.    On April 20, 2022, the Company issued a press release titled "Ampio Provides Regulatory Update." In the press release the Company stated, in relevant part, that:

> FDA responded that it did not agree with the Company's proposed change from the ITT population to the mITT population for the primary endpoint analysis, that mITT is a substantive and material change to the Protocol and Statistical Analysis Plan that is not in accordance with the Special Protocol Assessment agreement, and that despite the COVID related impact on patients and trial centers, the Company should have sought FDA's agreement on these changes prior to analyzing and unblinding the data. FDA further stated that it did not agree that AP-013 could serve as a second pivotal trial for Ampion based on both the change in the analysis population and the analysis of pain only instead of the original prespecified co-primary endpoints.

143.    The press release further stated that:

"We are very disappointed in FDA's answer. Ampion has been in development for several years, and many shareholders have remained loyal to the company throughout the ups and downs of that development history. Severe osteoarthritis of the knee is an unmet medical need that affects nearly 17 million people in the United States, and we continue to believe that Ampion is a drug which can provide a safe and efficacious treatment for many of those patients. However, given the points in FDA's answer, it will be very difficult to salvage AP-013 itself as a pivotal trial. Nonetheless, we and our regulatory experts believe there may be ways to do that, and we will follow-up with the FDA in the near term to discuss those options," said Mike Martino Chief Executive Officer and Chairman of Ampio. "However, I want to be clear. At this point, I believe the best path forward for Ampio and Ampion is likely conducting a new Phase 3 trial. This management team has learned a great deal from conducting and analyzing the prior trials, including AP-013, and believe we are positioned to design and execute a trial that can lead to BLA approval."

144. After this press release came out, the share price of Ampio stock fell to a close of $0.25 per share on April 21, 2022 from a close of $0.34 per share on April 20, 2022. The stock dropped 26.47%.

### *May 16, 2022 Press Release*

145. On May 16, 2022, Ampio issued a press release titled "Ampio Independent Committee to Conduct Investigation." In the press release, the Company stated that it had created the Special Committee.

146. The press release further stated that the Special Committee along with the assistance from an independent legal counsel was in the process of conducting internal investigations with regards to the AP-013 study.

147. After this news came out, the Company's share price fell from a close of $0.22 per share on May 16, 2022 to a close of $0.18 per share on May 18, 2022. The share price fell 10%.

148. On May 28, 2022, three of the Company's longest serving directors, Defendants Bar-Or, Coelho and Giles, resigned from the Company.

***July 5, 2022 Proxy Statement***

149.     On July 5, 2022, the Company filed its 2022 Proxy Statement. Defendants Martino,

Stevens, and Buchi solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the

Exchange Act, which contained material misstatements and omissions.

150.     The 2022 Proxy Statement called for the Company shareholders to vote to, *inter*

*alia*: (1) elect Defendant Macaluso, Buchi and Stevens to the Board; and (2) ratify the selection of

Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal

year ending December 31, 2022.

151.     With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated:

> We have adopted a Code of Business Conduct and Ethics that is applicable to all of
> our employees, officers, and directors, all of which have read, acknowledged, and
> agreed to comply with such code. The code is available on our web site,
> *www.ampiopharma.com*, under the "Investors" tab. We intend to disclose future
> amendments to, or waivers from, certain provisions of our Code of Business
> Conduct and Ethics, if any, on the above website within four business days
> following the date of such amendment or waiver.

152.     With respect to the Company's Insider Policy, the 2022 Proxy Statement mentioned

that the Company's Insider Policy was "applicable to all of our employees, officers, and directors"

stating that:

> We have adopted an Insider Trading Policy that is applicable to all of our officers
> and directors and all of our employees, consultants, and contractors (including
> members of scientific advisory committees), who receive or have access to material
> nonpublic information about the Company. The Insider Trading Policy prohibits
> the misuse of material nonpublic information in trading of the Company's
> securities. The Insider Trading Policy also prohibits short sales, transactions in
> derivative securities on the Company's securities, pledges of the Company's
> securities as collateral for loans, and hedging or monetization transactions or
> similar arrangements with respect to the Company's securities. The Insider Trading
> Policy is available on our web site, *www.ampiopharma.com*, under the "Investors"
> tab.

153.     Regarding the Board of Directors' Role in Risk Oversight, the 2022 Proxy Statement said:

> The Board oversees risk management directly and through its committees associated with their respective subject matter areas. Generally, the Board oversees risks that may affect our business, including operational matters and other matters that have been adversely impacted by the COVID- 19 pandemic. The Board also reviews and approves the renewal of the Company's annual insurance policies. In addition, as part of its oversight of our Company's executive compensation program, the Board considers the impact of such program, and the incentives created by the compensation awards that it administers, on our Company's risk profile. Our Board, based on the Compensation Committee's review of all of our compensation policies and procedures, considers the incentives that they create and factors that may reduce the likelihood of excessive risk taking and determines whether they present a significant risk to our Company. The Board has determined that, for all employees, our compensation programs do not encourage excessive risk and instead encourage behaviors that support sustainable value creation.

154.     Regarding the Audit Committee's oversight on financial reporting, the 2022 Proxy Statement stated that:

> The Audit Committee is responsible for oversight of our accounting and financial reporting processes and discusses with management our financial statements, internal controls and other accounting and auditing matters. The Compensation Committee  oversees certain risks related to compensation programs and the Nominating and Governance Committee oversees certain corporate governance risks.

155.     Regarding the Audit Committee report, the 2022 Proxy Statement stated that:

> The Audit Committee evaluates auditor performance, manages relations with the Company's independent registered public accounting firm, and evaluates policies and procedures relating to internal control systems. The Audit Committee operates under a written Audit Committee Charter that has been adopted by the Board, a copy of which is available on the Company's website. All members of the Audit Committee currently meet the independence and qualification standards for Audit Committee membership set forth in the listing standards provided by the NYSE American and the SEC.

156.     The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous

false and misleading statements alleged herein and the Individual Defendant's failures to report violations of the Code of Conduct.

157.    Defendants Martino, Stevens, and Buchi caused the 2022 Proxy Statement to be false and misleading, with regard to the statements in ¶¶ 151-155 by failing to disclose that: (1) the Company lacked the ability to successfully file a BLA for Ampion; (2) the Company provided inaccurate results of the AP-013 study; (3) the Company misstated the true timing of unblinding of data from the AP-013 study consequently, and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

158.    As a result of Defendants Martino, Stevens, and Buchi causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) elect Defendant Macaluso, Buchi and Stevens to the Board; and (2) ratify the selection of Moss Adams LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2022.

## The Truth Emerges

### August 3, 2022 Press Release

159.    On August 3, 2022, Ampio issued a press release titled "Ampio Letter To Stockholders." The press release contained the Stockholder Letter that was written by Defendant Martino and Defendant Buchi.

160.    The Stockholder Letter mentioned the reasons that the Company decided to conduct an internal investigation, stating that:

> As we announced on May 16, 2022, an independent special committee of the Ampio Board of Directors (the "Special Committee") has been conducting internal

investigations focused primarily on (1) the statistical analysis of Ampio's AP-013 clinical trial and (2) unauthorized provision of Ampion, an investigational drug that is not approved by the Food and Drug Administration ("FDA"), for use by individuals not participating in clinical trials ("unauthorized use"). These investigations are now completed and the investigations are summarized below.

161.    The Stockholder Letter disclosed the Special Committee's primary findings, which included that "certain former Ampio executive officers and senior staff were aware" of the fact that "the AP-013 trial did not demonstrate efficacy for Ampion on its co-primary endpoints of pain and function; and that these former Ampio executive officers and senior staff did not fully report the results of the AP-013 trial and the timings of unblinding of data from the AP-013 trial.

162.    The Stockholder Letter further stated that the Special Committee's investigations found that "certain Ampio personnel, including a former executive officer and certain former directors, facilitated the provision of Ampion for unauthorized use."

163.    After the results of the Special Committee investigations were revealed in the Stockholder Letter, the Company's share price fell to a close at $0.10 per share on August 3, 2022, representing a staggering 96.25% declination in Ampio's market share compared to the beginning of the Relevant Period, where the Company's shares closed at a high of $2.76 per share on December, 22, 2020.

164.    The results of the Special Committee's investigation were reported to the SEC and the FDA. The Company later admitted that after seven phase II and III trials, which comprised of more than 1,500 Ampion treated patients and more than 1,400 saline treated patient that "Ampion has simply not demonstrated a sufficient therapeutic benefit versus saline to support another superiority trial and a noninferiority trial verses saline would not be commercially competitive."

165.    On October 4, 2022, The Company filed a Form 8-K with the SEC that stated in

pertinent part:

the staff of NYSE Regulation has determined to commence proceedings to delist
the Company's common stock from the Exchange.  Trading in the Company's
common stock was suspended.

NYSE Regulation staff determined that the Company is no longer suitable for
listing pursuant to Section 1033(f)(v) of the NYSE American Company Guide due
to the abnormally low trading price of the Company's common stock. The
Exchange's application to the Securities and Exchange Commission to delist the
Company's common stock is pending, subject to the completion of the Exchange's
applicable procedures, including any appeal by the Company of NYSE
Regulation's decision.

Prior to receipt of the letter from NYSE American, the Company began actively
taking steps to regain compliance with the listing standards of the NYSE American.
Specifically, the Company's Board of Directors unanimously approved and
recommended that the Company's stockholders approve an amendment to the
Company's certificate of incorporation to effect a reverse stock split of the
Company's common stock at a ratio of not less than 5-to-1 and not greater than 15-
to-1, with the exact ratio to be determined by the Board in its discretion before
October 13, 2023 (the "Reverse Stock Split"). The Company has called a Special
Meeting of Stockholders for October 13, 2022 to consider the Reverse Stock Split.
Consummation of the Reverse Stock Split may increase the price of the Company's
shares of common stock and, as a result, would likely enable the Company to
maintain a higher market price for its common stock, although there can be no
assurance that the Company's stockholders will approve the Reverse Stock Split.
There can be no assurance that the Company will appeal the Exchange's
determination or the outcome of any such appeal. There can be no assurance that
the Exchange will reconsider their decision to delist in light of such appeal.

In the meantime, the Company's common stock will trade on the OTC Pink under
the symbol "AMPE". The Company can provide no assurance that its common
stock will continue to trade on this market, that brokers will continue to provide
public quotes of the Company's common stock on this market or otherwise make a
market in the Company's common stock or that the trading volume of the
Company's common stock will be sufficient to provide for an efficient trading
market.

**Repurchases During the Relevant Period**

166.     During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company repurchased 138,514 shares of its common stock at inflated prices during the Relevant Period for $78,953.

167.     Specifically, according to the Company's 1Q22 10-Q, within the Relevant Period during the three months ended March 31, 2022, the Individual Defendants caused the Company to, in January 2022, repurchase 138,514 shares of its own common stock at an average price per share of 0.57, for a total cost to the Company of approximately $78,953.

168.     As the Company's stock was actually only worth $0.10 per share, the lowest price at which it was trading on August 3, 2022, the Company overpaid approximately $65,102 in total.

**DAMAGES TO AMPIO**

169.     As a direct and proximate result of the Individual Defendants' conduct, Ampio has lost and expended, and will lose and expend, many millions of dollars.

170.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and its CEO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

171.     Such losses include the Company's overpayment by nearly $65,102 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

172.     Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

173.     As a direct and proximate result of the Individual Defendants' conduct, Ampio has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

174.     Plaintiff brings this action derivatively and for the benefit of Ampio to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ampio, waste of corporate assets, unjust enrichment, and violations of Section 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

175.     Ampio is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

176.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Ampio. Plaintiff will adequately and fairly represent the interests of Ampio in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

177.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

178.    A pre-suit demand on the Board of Ampio is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following four individuals: Defendants Martino, Buchi, and Stevens (the "Director-Defendants"), and non-defendant Elizabeth Varki Jobes (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to two of the four Directors that were on the Board at the time this action was commenced.

179.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

180.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

181.    Additional reasons that demand on Defendant Martino is futile follow. Defendant Martino has served as the Company's CEO since November 2021 and as a member of the Board since October 2021. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Martino with his principal occupation, and he receives handsome compensation, including approximately $1 million during 2021 Fiscal Year. As the Company provides Defendant Martino with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Ampio. Defendant Martino was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Martino is a defendant in the Securities Class Action. For these reasons, too, Defendant Martino breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Buchi is futile follow. Defendant Buchi has served as a Company director since October 2021 and serves as a member of the Audit Committee. Defendant Buchi is also the Chair of the Board. Defendant Buchi receives handsome

compensation, including $254,498 during 2021 Fiscal Year. In addition, he solicited the 2022 Proxy Statement which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Buchi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Stevens is futile follow. Defendant Stevens has served as a Company director since June 2011. He is also a member of the Audit Committee, Compensation Committee, and Nominating and Governance Committee. Defendant Stevens receives handsome compensation, including $288,921 during 2021 Fiscal Year and $136,970 during the fiscal year ended December 31, 2020. In addition, he solicited the 2021 and 2022 Proxy Statements which contained false and misleading elements that contributed, *inter alia*, to shareholders reelecting him to the Board. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Stevens has been a director of the Company since the first clinical trial of Ampion started in 2013. He had all the knowledge of what was going on and how was the drug performing. Due to his extensive background and education in sciences, he was fully able to comprehend how Ampion was performing. However, he chose to falsely mislead the stockholders and public. For

these reasons, too, Defendant Stevens breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on the Board is futile follow.

185.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

186.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

187.    Ampio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Ampio any part of the damages Ampio suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

188.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

189.    The acts complained of herein constitute violations of fiduciary duties owed by Ampio officers and directors, and these acts are incapable of ratification.

190.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ampio. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Ampio, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

191.   If there is no directors' and officers' liability insurance, then the Directors will not cause Ampio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

192.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least two of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Defendants Martino, Macaluso, Bar-Or, Buchi, Coelho, Giles and Stevens for Violations of Section 14(a) of the Exchange Act**

193.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

195.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

196.   Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens caused the 2021 Proxy Statement to be false and misleading by failing to disclose that: (1) the Company hyped its ability to successfully file a BLA for Ampion; (2) the Company provided exaggerated results of the AP-013 study; (3) the Company similarly misstated the true timing of unblinding of data from the AP-013 study, and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

197.   The 2021 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by two of the Individual Defendants, and Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens' failures to report violations of the Code of Conduct.

198.   The false and misleading elements of the 2021 Proxy Statement led to the re-election of Defendants Macaluso, Bar-Or, Coelho, Giles and Stevens, which allowed them to continue breaching their fiduciary duties to Ampio.

199.   Defendants Martino, Stevens, and Buchi caused the 2022 Proxy Statement to be false and misleading by failing to disclose that: (1) the Company hyped its ability to successfully file a BLA for Ampion; (2) the Company provided exaggerated results of the AP-013 study; (3) the Company similarly misstated the true timing of unblinding of data from the AP-013 study, and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

200.     The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendant's failures to report violations of the Code of Conduct.

201.     The false and misleading elements of the 2022 Proxy Statement led to the re-election of Defendants Martino, Stevens, and Buchi, which allowed them to continue breaching their fiduciary duties to Ampio.

202.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

203.     Plaintiff on behalf of Ampio has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the
Securities Exchange Act of 1934**

204.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Ampio. Not only is Ampio now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Ampio by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase nearly 138,514 of its own shares on the open market at artificially inflated prices, damaging Ampio

by nearly $65,102 while two of them engaged in improper insider sales, netting proceeds of approximately $214,468.

206.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

207.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ampio not misleading.

208.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Ampio. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from

them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

209.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

210.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

211.    Plaintiff on behalf of Ampio has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    The Individual Defendants, by virtue of their positions with Ampio and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Ampio and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Ampio to engage in the illegal conduct and practices complained of herein.

214.    Plaintiff, on behalf of Ampio, has no adequate remedy at law.

**FOURTH CLAIM**

**Against Individual Defendants for Breach of Fiduciary Duties**

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ampio's business and affairs.

217.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ampio's business and affairs.

219.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

220.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ampio.

221.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

222.    In further breach of their fiduciary duties owed to Ampio, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, inter alia, that: (1) the Company hyped its ability to successfully file a BLA for Ampion; (2) the Company provided exaggerated results of

the AP-013 study; (3) the Company similarly misstated the true timing of unblinding of data from the AP-013 study, and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

223.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

224.    The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase nearly 138,514 of its own shares on the open market at artificially inflated prices, damaging Ampio by nearly $65,102 while two of them engaged in improper insider sales, netting proceeds of approximately $214,468.

225.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

226.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

227.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

228.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ampio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

229.    Plaintiff on behalf of Ampio has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

230.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ampio.

232.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Ampio that was tied to the performance or artificially inflated valuation of Ampio, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

233.     Plaintiff, as a shareholder and a representative of Ampio, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

234.     Plaintiff on behalf of Ampio has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

235.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

237.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

238.     Plaintiff on behalf of Ampio has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ampio, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ampio;

(c)     Determining and awarding to Ampio the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Ampio and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ampio and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Ampio to nominate at least two candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Ampio restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 7, 2022

Respectfully submitted,

*/s/ Karen Cody Hopkins*
**CODY-HOPKINS LAW FIRM**
Karen Cody Hopkins # 35367
4610 S. Ulster St # 150
Denver, Colorado 80237
T: (303) 221-4666
F: (888) 551-1053
E: karen@codyhopkinslaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
T: (516) 922-5427
F: (516) 344-6204
E: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*